IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Dawn Pettit Payne, | ) | C/A No.: 1:16-3222-TMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Nancy A. Berryhill,[1] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

　　　　This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two
issues before the court are whether the Commissioner's findings of fact are supported by
substantial evidence and whether she applied the proper legal standards. For the reasons
that follow, the undersigned recommends that the Commissioner's decision be reversed
and remanded for further proceedings as set forth herein.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23,
2017. Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Acting
Commissioner Carolyn W. Colvin as the defendant in this lawsuit.

I.      Relevant Background

        A.      Procedural History

        On September 4, 2013, Plaintiff protectively filed an application for DIB in which she alleged her disability began on August 28, 2013. Tr. at 96 and 176–82. Her application was denied initially and upon reconsideration. Tr. at 98–101 and 104–05. On June 2, 2016, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Clinton C. Hicks. Tr. at 33–73 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 7, 2016, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 15–32. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 26, 2016. [ECF No. 1].

        B.      Plaintiff's Background and Medical History

                1.      Background

        Plaintiff was 36 years old at the time of the hearing. Tr. at 38. She completed high school and two years of college. *Id.* Her past relevant work ("PRW") was as a medical assistant and a podiatric assistant. Tr. at 66. She alleges she has been unable to work since August 1, 2013. Tr. at 38.

                2.      Medical History

        Plaintiff was transported to Springs Memorial Hospital on February 4, 2007, after having intentionally overdosed on 15 50-milligram Ultram tablets. Tr. at 330. She was

diagnosed with brief reactive psychosis and was instructed to follow up with a mental health provider. Tr. at 341.

On March 13, 2009, Plaintiff presented to Marvin E. Knight, III, M.D. ("Dr. Knight"). Tr. at 266. She endorsed a 10-year history of moderate-to-severe fatigue, but indicated her symptoms were gradually worsening. *Id.* Dr. Knight ordered multiple lab tests and a sleep study and prescribed a vitamin B-12 injection. Tr. at 267.

On May 21, 2009, a sleep study revealed mild primary snoring and possible mild periodic limb movements in sleep. Tr. at 270.

Plaintiff followed up with Dr. Knight on May 27, 2009, to discuss the sleep study results. Tr. at 263. She complained of fatigue and excessive daytime sleepiness. *Id.* Dr. Knight prescribed Provigil. Tr. at 265.

On June 28, 2010, magnetic resonance imaging ("MRI") of Plaintiff's cervical spine showed minimal reversal of the normal cervical lordosis and mild disc narrowing, desiccation change, and asymmetric annular disc pathology with a more focal left foraminal component at C5-6. Tr. at 315–16.

On July 22, 2010, Plaintiff complained of lower neck pain that she described as burning and aching/pressing and rated as a seven on a 10-point scale. Tr. at 291. Sanjay Nandurkar, M.D. ("Dr. Nandurkar"), observed Plaintiff to be tender over her lower bilateral cervical paraspinal muscles, but to have no painful restriction of range of motion ("ROM") or neck stiffness. Tr. at 292. He administered a cervical epidural steroid injection. Tr. at 292–93.

Plaintiff presented to neurologist Tooba Khan, M.D. ("Dr. Khan"), for an initial consultation on July 25, 2012. Tr. at 380. She reported having experienced two headaches per week that were focused in her temporal area and that would last for a few hours at a time. *Id.* She indicated that during her menstrual cycle, she experienced severe headaches that were accompanied by nausea, vomiting, and photophobia. *Id.* Dr. Khan indicated Plaintiff had headaches with "migrainous features," but also appeared to have some component of analgesic-rebound headache. *Id.* He instructed Plaintiff to discontinue all over-the-counter medications, to complete a course of Prednisone, and to take Amitriptyline at night. *Id.*

On August 29, 2012, Plaintiff indicated that her daily headaches had improved. Tr. at 382. She reported that she continued to experience two to three severe headaches per week, but that they were relieved by Fioricet. *Id.* Dr. Khan instructed Plaintiff to continue to take Amitriptyline and added a prescription for Topamax. *Id.*

On January 18, 2013, Plaintiff reported that her headaches had been "very well controlled" over the prior six-month period. Tr. at 383. She indicated she had only experienced a few headaches and had not required rescue medication. *Id.* Dr. Khan noted that Plaintiff had been losing weight. *Id.* He discontinued Amitriptyline and advised Plaintiff "to make sure that she eats right." *Id.*

On February 18, 2013, Plaintiff reported that her headache medication was working, but that she was experiencing generalized fatigue. Tr. at 384. She indicated she was constantly tired while working and was having to take naps in patients' rooms during the workday. *Id.* She complained of pain, discomfort, and heaviness in her neck. *Id.* Dr.

Khan noted that Plaintiff had symptoms of narcolepsy, fatigue, and fibromyalgia. *Id.* He replaced Amitriptyline with Vimpat and scheduled an electroencephalogram ("EEG") of Plaintiff's brain. *Id.*

Plaintiff presented to Springs Memorial Hospital on February 21, 2013, complaining of a two-week history of weakness, fatigue, nausea, and shortness of breath. Tr. at 301. Laboratory tests and an electrocardiogram ("EKG") were normal. Tr. at 304. The attending physician diagnosed generalized weakness and instructed Plaintiff to continue to take iron pills. Tr. at 305.

Dr. Khan performed an EEG on February 25, 2013. Tr. at 397. He interpreted the study as mildly abnormal based on rare and intermittent focal slowing in the left temporoparietal leads. *Id.* He indicated the finding could be consistent with left hemispheric dysfunction and that a sleep-deprived EEG should be considered. *Id.*

On February 26, 2013, Plaintiff reported neck pain and increased fatigue. Tr. at 385. Dr. Khan discontinued Topamax, prescribed Lamictal for mood stabilization and wakefulness, and instructed Plaintiff to take Amitriptyline at night. *Id.* He indicated he would schedule Plaintiff for a multiple sleep intensity test ("MSLT").[2] *Id.*

---

[2] The MSLT is a daytime study conducted in a sleep laboratory the day after an individual undergoes an overnight polysomnogram. *Diagnosing Sleep Disorders*, 10 NIH MEDLINE PLUS 21 (2015). Available from: https://medlineplus.gov/magazine/ issues/summer15/ articles/summer15pg21.html. The individual is asked to take four or five naps that are initiated every two hours. *Id.* Monitoring devices record how long it takes the individual to fall asleep and how long it takes her to reach various stages of sleep during the naps. *Id.* Individuals with normal sleep patterns either do not fall asleep or take a long period to fall asleep during the nap periods. *Id.* Individuals with sleep disorders typically fall asleep in less than five minutes. *Id.* A court may take judicial notice of factual information located in postings on government websites. *See Phillips v.*

On March 4, 2013, Plaintiff reported that she was getting some rest and feeling much better, and Dr. Khan noted that she was handling the initial dose of Lamictal without problems. Tr. at 386. Dr. Khan indicated Plaintiff's EEG showed questionable slowing and that her symptoms appeared to be consistent with narcolepsy. *Id.*

On April 19, 2013, a polysomnogram[3] showed few events and a low oxygen saturation of 94%. Tr. at 402. Dr. Khan interpreted the study to indicate an unspecified physiological sleep disorder. Tr. at 405. An MSLT showed Plaintiff to have mean sleep latency of 1.8 minutes and was consistent with narcolepsy without cataplexy. Tr. at 409.

On May 23, 2013, Dr. Khan indicated that Plaintiff had recently been diagnosed with narcolepsy after a polysomnogram followed by MSLT documented REM sleep in two naps. Tr. at 387. He stated Plaintiff had been started on Methylphenidate. *Id.* Plaintiff reported that the Methylphenidate had initially helped, but had become less effective. *Id.* Dr. Khan noted Plaintiff's headaches seemed to be okay and that she appeared to have no side effects from Lamictal and Amitriptyline. *Id.* He recommended that Plaintiff start Xyrem. *Id.*

On June 13, 2013, Plaintiff reported feeling better overall, but experiencing jitteriness and minor headaches in the mornings. Tr. at 388. Dr. Khan noted that Plaintiff

---

*Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("court may take judicial notice of matters of public record").

[3] A polysomnogram is an overnight sleep study. *Diagnosing Sleep Disorders*, 10 NIH MEDLINE PLUS 21 (2015). Available from: https://medlineplus.gov/magazine/issues/summer15/ articles/summer15pg21.html. It involves placement of electrodes and other monitors on an individual's scalp, face, chest, limbs, and finger. *Id.* As the individual sleeps, the electrodes monitor brain activity, eye movement, muscle activity, heart rate and rhythm, blood pressure, air movement in and out of her lungs, and oxygen saturation in her blood. *Id.*

seemed to have a stressful job and to be busy at work. *Id.* He indicated Plaintiff appeared to be suffering from depression. *Id.* He decreased Plaintiff's dose of Methylphenidate to five milligrams twice a day and instructed her to continue to increase her dosage of Xyrem and to start Lexapro. *Id.*

On August 1, 2013, Dr. Khan indicated Plaintiff's medication was stopped and restarted at a lower dose after she reported severe anxiety with the increased dose of Xyrem. Tr. at 390. Plaintiff reported her sleep had improved by 75% and her headaches were better. *Id.* She indicated she felt tired, but was able to work in the office for long hours. *Id.* Dr. Khan stated Plaintiff appeared to be very stable with a combination of Xyrem, 10 milligrams of Adderall, 20 milligrams of Lexapro, and 0.5 milligram of Klonopin. Tr. at 390–91.

Plaintiff reported improvement in her symptoms on August 28, 2013, but indicated she was very stressed out because of the demands of her job. Tr. 393. She informed Dr. Khan that she would take a nap during the workday, but that it did not improve her ability to spend time with her children in the evening. *Id.* She indicated that Xyrem was causing her to lose weight. *Id.* She stated she could not continue to work with her current disease. *Id.* Dr. Khan indicated Plaintiff was "unable to cope with her demands of the disease and very stressful job." Tr. at 394. He stated he would allow Plaintiff to have "time off from work" and would reevaluate her in six weeks. *Id.*

On September 13, 2013, Dr. Khan indicated Plaintiff had been diagnosed with narcolepsy, depression, and adjustment reaction disorder. Tr. at 379. He stated Plaintiff experienced forgetfulness and short-term memory loss. *Id.*

Plaintiff presented to Ulyesse C. Everall, F.N.P. ("Ms. Everall"), on September 25, 2013, with complaints of sinus pressure and fatigue. Tr. at 417–18. Ms. Everall diagnosed sinusitis, cough, pharyngitis, fatigue, and decreased ferritin. Tr. at 419. She followed up with Plaintiff the next day to inform her that her lab test results were normal. Tr. at 420. Plaintiff reported feeling better. *Id.*

On October 9, 2013, Plaintiff reported that she had been out of work for the past few weeks. Tr. at 438. She stated she felt better if she took naps between 10:00 and 11:30 a.m. and 1:00 and 2:30 p.m. *Id.* She reported her headaches were well-controlled. *Id.* She stated her mood had improved, but that she was worried that she would not have sufficient income. *Id.* She complained of neck pain. *Id.* Dr. Khan observed no abnormalities on physical examination. Tr. at 438–39. He prescribed Zanaflex for neck pain and instructed Plaintiff to continue using her other medications. Tr. at 439.

Plaintiff reported that her narcolepsy, headaches, and depression were stable on October 31, 2013. Tr. at 431. She complained of constant neck pain. *Id.* Dr. Khan indicated he had reviewed Plaintiff's cervical MRI, but that it showed only mild pathology that was not significant enough "to cause that amount of pain." *Id.* Plaintiff demonstrated normal motor strength, reflexes, and sensation. Tr. at 432. Dr. Khan indicated he was reluctant to add any further medications and that he was referring Plaintiff for placement of a transcutaneous epidural nerve stimulation ("TENS") unit and to sleep medicine specialist William Sherrill, M.D. ("Dr. Sherrill"), for a second opinion. *Id.*

Plaintiff presented to Dr. Sherrill on November 19, 2013. Tr. at 499. She reported that she often slept for 12 or more hours on the weekends and would nap for up to two hours per day. *Id.* Dr. Sherrill assessed excessive sleepiness, prescribed Ritalin, decreased Plaintiff's dosage of Clonazepam, and instructed her to continue her other medications. Tr. at 501.

On November 25, 2013, Plaintiff reported some improvement in narcolepsy with the addition of Ritalin. Tr. at 455. She indicated that Lexapro was effectively treating her mood symptoms. *Id.* Dr. Khan observed Plaintiff to have some tenderness to palpation. Tr. at 455. He stated Plaintiff had "features of fibromyalgia" and prescribed Vimpat. Tr. at 456.

Plaintiff followed up with Dr. Sherrill to review her sleep log on December 17, 2013. Tr. at 503. Dr. Sherrill noted that the log showed Plaintiff to have variable sleep onset that occurred as early as 8:00 p.m. and as a late as 11:00 p.m. *Id.* He stated Plaintiff had recorded mid-afternoon naps that lasted from two to three hours on most days and had recorded morning naps on three out of 14 days. *Id.* He instructed Plaintiff to engage in regular sleep-wake cycles; to schedule naps once or twice a day for one to two hours at a time; to hold off on taking Ritalin and Clonazepam; to start Adderall XR; and to continue to maintain a sleep log. Tr. at 504.

On January 9, 2014, Plaintiff reported having experienced significant fatigue over the prior week. Tr. at 507. Dr. Sherrill increased Plaintiff's dosage of Xyrem to six grams and prescribed two 20-milligram doses of Adderall XR daily and up to two 10-milligram

doses of short-acting Adderall. Tr. at 508. He instructed Plaintiff to continue to maintain a sleep log. *Id.*

Dr. Khan observed Plaintiff to have "tender spots," but no other abnormalities during an examination on January 15, 2014. Tr. at 459. He referred Plaintiff to a psychiatrist for depressive symptoms and indicated he thought Plaintiff's "symptoms of migraine and fibromyalgia [were] stemming from her depressive disorder." Tr. at 460.

On January 22, 2014, state agency consultant Xanthia Harkness, Ph. D. ("Dr. Harkness"), completed a psychiatric review technique ("PRT") on January 22, 2014. Tr. at 78–79. She considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders, but found that Plaintiff had no restriction of activities of daily living ("ADLs"), no difficulties in maintaining social functioning; and no difficulties in maintaining concentration, persistence, or pace. *Id.*

State agency medical consultant James Key, M.D. ("Dr. Key"), reviewed the evidence and completed a residual functional capacity ("RFC") assessment on January 22, 2014. Tr. at 79–80. He rated Plaintiff as having the following abilities: to occasionally lift and/or carry 50 pounds; to frequently lift and/or carry 25 pounds; to stand and/or walk for a total of about six hours in an eight-hour workday; and to sit for a total of about six hours in an eight-hour workday. *Id.* On May 15, 2014, state agency consultant Carl Anderson, M.D. ("Dr. Anderson"), indicated the same strength and exertional limitations as Dr. Key, but also found that Plaintiff should avoid even moderate exposure to hazards. Tr. at 91–92.

On February 10, 2014, Plaintiff informed Dr. Khan that she had missed her appointment with the psychiatrist. Tr. at 463. She reported some depressive symptoms and fibromyalgia-like pain and indicated she continued to take naps. *Id.* Dr. Khan indicated Plaintiff's headaches had improved and that she seemed stable on her medications. *Id.* He noted no abnormalities on examination. Tr. at 463–64. He stated Plaintiff's headaches, fibromyalgia, and neck pain were likely caused by "some underlying depression" and that she should see a psychiatrist. Tr. at 464.

Plaintiff complained of headaches and stated she was "feeling weird" on February 15, 2014. Tr. at 484. Caitlin Gerrald, PA-C ("Ms. Gerrald"), assessed herpes zoster and prescribed Valtrex and Hydrocodone-Acetaminophen. Tr. at 485.

On March 11, 2014, Plaintiff reported that her medications made her feel better overall. Tr. at 510. She indicated the prior month had been stressful because of symptoms of shingles and problems with her husband and family. *Id.* Dr. Sherill recommended Plaintiff continue Xyrem and Adderall XR at her current dosages. Tr at 511. He instructed her to take five milligrams of Adderall at 10:00 a.m., another five milligrams at 2:00 p.m., and a third five-milligram dose between 4:00 and 5:00 p.m. Tr. at 512. He advised her to taper down her dosage of Clonazepam to half a tablet and to discontinue it after two weeks at the reduced dose. *Id.* He told her to taper down Lexapro to 10 milligrams per day. *Id.* He recommended Plaintiff obtain a psychiatric evaluation "to determine if mood disorder [was] an issue and what would be appropriate therapy." *Id.*

State agency consultant Anna P. Williams, Ph. D. ("Dr. Williams"), completed a PRT on May 20, 2014. Tr. at 89–90. She considered Listings 12.04 and 12.06 and found

that Plaintiff had no restriction of ADLs, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. *Id.*

On July 1, 2014, Dr. Khan administered electromyography ("EMG") and nerve conduction velocity ("NCV") studies in response to Plaintiff's complaints of numbness and tingling in her bilateral hands. Tr. at 527. He found no evidence of neuropathy. Tr. at 528.

Plaintiff presented to psychiatrist Thomas M. Fitzgerald, M.D. ("Dr. Fitzgerald"), on August 22, 2014. Tr. at 530. Dr. Fitzgerald indicated diagnostic impressions of recurrent major depressive disorder, history of attention deficit disorder ("ADD") as a child, and unspecified anxiety state. Tr. at 530. He assessed Plaintiff's global assessment of functioning ("GAF")[4] score to be 41–50,[5] and indicated this was consistent with "Serious Symptoms/Impairment In Functioning." *Id.* He discontinued Lexapro and prescribed Fetzima. *Id.*

Plaintiff followed up with Dr. Sherrill on August 29, 2014. Tr. at 596. She informed him that Dr. Fitzgerald had discontinued Lexapro and prescribed Fetzima, but had subsequently decreased the dosage of Fetzima because it had caused increased

---

[4] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[5] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR.*

fatigue and mood instability. *Id.* She indicated she was no longer taking Clonazepam and Gabapentin. *Id.* Dr. Sherrill suggested that Plaintiff consider tapering off all her medications and restarting therapy. *Id.* Plaintiff reported that she was having increased difficulty with getting up in the middle of the night. Tr. at 597. She stated she felt better when she was able to sleep later. *Id.* She indicated she was unable to read a book because of difficulty focusing. *Id.* Dr. Sherrill advised Plaintiff to follow regular sleep and wake cycles; to maintain a sleep log for two weeks; to continue taking Adderall; to decrease Xyrem to four grams nightly; and to obtain a sleep study. *Id.*

On October 15, 2014, a polysomnogram showed no evidence of obstructive sleep apnea or upper airway resistance syndrome and indicated Plaintiff had normal sleep efficiency. Tr. at 617. Plaintiff underwent an MSLT the next day. Tr. at 613. It indicated she had average sleep latency across five naps of 1.3 minutes. *Id.* Dr. Sherrill stated Plaintiff's sleep latency was indicative of hypersomnolence. *Id.*

Plaintiff followed up with Dr. Fitzgerald on October 24, 2014. Tr. at 558. She reported having felt too anxious while taking 240 milligrams of Fetzima, but indicated she was doing better on a 40-milligram dose. *Id.* She indicated her mood was "more even," but that she had low energy and "horrible" fatigue. *Id.* She reported ongoing neck pain. *Id.* Dr. Fitzgerald indicated he would titrate up Plaintiff's dosage of Fetzima. Tr. at 560.

Plaintiff presented to James M. Wilson, M.D. ("Dr. Wilson"), on October 27, 2014, for evaluation of a possible inflammatory or autoimmune disease process. Tr. at 534. She complained of increasing joint difficulty, deformities, numbness, and swelling

in her fingers and toes. *Id.* Dr. Wilson indicated he would obtain a variety of laboratory studies to determine if Plaintiff's symptoms could be explained by a measurable inflammatory or immune process. Tr. at 535. The test results showed no clinically-significant abnormalities. *See* Tr. at 536–40.

Plaintiff followed up with Dr. Sherrill on October 27, 2014, to discuss the results of the sleep study and MSLT. Tr. at 600. She reported that Dr. Fitzgerald had increased her dose of Fetzima from 20 to 80 milligrams and indicated that the increased dose had provided some improvement in her daytime energy level. Tr. at 601. Dr. Sherrill recommended that Plaintiff taper and stop Xyrem and indicated he would continue to monitor her response to the increased dose of Fetzima. Tr. at 601–02.

On December 19, 2014, Plaintiff reported some improvement in her mood. Tr. at 562. She endorsed decreased appetite, increased sleep, low energy, and poor concentration. Tr. at 563. Dr. Fitzgerald noted no abnormalities on examination. Tr. at 564. He indicated he would titrate up Plaintiff's dosage of Fetzima. *Id.*

Plaintiff presented to Kate Chan, PA-C ("Ms. Chan"), for pain in her neck and upper trapezius on February 9, 2015. Tr. at 542. Ms. Chan observed no abnormalities on examination. Tr. at 544–46. Her impressions were myalgia, spinal enthesopathy, and narcolepsy cataplexy syndrome. Tr. at 546. She referred Plaintiff for physical therapy. Tr. at 547.

Plaintiff reported that her sleep quality was good and that her daytime functioning was fair on May 1, 2015. Tr. at 604. She indicated she had been more active. *Id.* Dr.

Sherrill instructed Plaintiff to continue taking Adderall, to avoid driving or operating machinery if sleepy, and to follow up in eight months. Tr. at 606.

On June 5, 2015, Plaintiff reported that her mood was a little better and that she was a little less reactive. Tr. at 570. She indicated her energy was "not much better." *Id.* She reported that she felt anxious because she had separated from her husband. *Id.* Dr. Fitzgerald noted no abnormalities on examination. Tr. at 572. He advised Plaintiff to titrate off of Fetzima and to start taking 200 milligrams of Wellbutrin XL. Tr. at 573.

On October 8, 2015, Plaintiff reported that she had been under a lot of stress because of her separation from and reconciliation with her husband. Tr. at 574. Dr. Fitzgerald noted no abnormalities on mental status examination. Tr. at 576. He instructed Plaintiff to continue taking Wellbutrin. *Id.* He prescribed Buspirone and instructed Plaintiff to titrate her dosage up to 30 milligrams twice a day. Tr. at 577.

On December 4, 2015, Plaintiff reported that her mood had declined and that she had felt sad, teary, and apathetic over the prior two-to-three-week period. Tr. at 578. She indicated she had not tapered off of Buspar as instructed. *Id.* Dr. Fitzgerald observed Plaintiff to be teary and depressed, but to demonstrate no other abnormalities on mental status examination. Tr. at 579. He stated Plaintiff was no longer responding to Wellbutrin and that Buspar was providing no relief and possibly worsening her symptoms. *Id.* He instructed Plaintiff to taper off of Buspar and to start Brintellix. Tr. at 579–80.

On January 8, 2016, Plaintiff reported good sleep quality, but poor daytime functioning. Tr. at 608. She stated her mood had improved. *Id.* She indicated she was napping frequently and would typically sleep between 7:00 and 10:00 a.m. Tr. at 609.

She stated she may nap again for 45 minutes around 1:30 p.m. and for 20 minutes around 4:00 p.m. *Id.* Dr. Sherrill instructed Plaintiff to restart Xyrem on a nightly basis. *Id.*

      C.     The Administrative Proceedings

          1.     The Administrative Hearing

             a.     Plaintiff's Testimony

At the hearing on June 2, 2016, Plaintiff testified she lived with her husband, her five-year-old son, and her eight-year-old daughter. Tr. at 37. She stated she was 5'5" tall and weighed 110 pounds. *Id.* She indicated that her normal weight was approximately 96 pounds and that she had struggled for years to keep her weight up. *Id.*

Plaintiff testified that she stopped working because her narcolepsy caused sleepiness and forgetfulness. Tr. at 41. She indicated her boss often had to repeat his orders to her. *Id.* She stated that caring for patients had caused her to feel physically drained. *Id.* She indicated that she would sleep during her lunch breaks. Tr. at 42. She stated she decided to leave her job because she did not feel like she could continue to do it. Tr. at 41

Plaintiff testified that she took medication to sleep during the night and to stay awake during the day. Tr. at 42. She indicated that each day she required at least two naps that would last for an hour or more at a time. *Id.* She stated she would sleep for 10 to 12 hours each night. Tr. at 44.

Plaintiff testified that she experienced approximately three migraines every two to three weeks. Tr. at 46. She indicated that her migraines had improved with use of contraceptive medication. *Id.* She stated she felt tightness in her neck and shoulders as a

result of chronic fatigue. Tr. at 47. She indicated that fibromyalgia caused soreness throughout her body. Tr. at 48. She stated she had received cervical epidurals, spinal decompressions, and acupuncture; participated in physical therapy; and used a TENS unit and medications to treat her pain. Tr. at 51. She rated her pain as typically being a seven on a 10-point scale. Tr. at 52. She stated she had also been diagnosed with depression and a depressive mood disorder. Tr. at 48–49.

Plaintiff testified that she experienced headaches and shakiness as side effects of her stimulant medications and nausea as a side effect of Xyrem. Tr. at 52. She indicated she was able to administer her own medications. Tr. at 53.

Plaintiff estimated she could stand for 10 to 15 minutes and sit for 30 minutes at a time. Tr. at 55–56. She indicated she did not walk for exercise, but admitted she could walk through a store with her husband. Tr. at 56. She stated she was able to lift her son, who weighed approximately 30 pounds. Tr. at 56–57.

Plaintiff testified that she was unable to engage in activities with her children because of her fatigue. Tr. at 49. She stated her mother and sister helped to care for her children. Tr. at 45. She indicated her mother drove her son to and from preschool and that he was typically out of the house until 2:00 p.m. each day. Tr. at 60. She indicated that her sister would pick up her daughter from an afterschool program. *Id.* She stated the Department of Motor Vehicles ("DMV") had declined to renew her driver's license because of her medical problems. Tr. at 50–51. She indicated she would cook dinner on three nights per week, wash dishes, and wash clothing. Tr. at 54. She stated she

occasionally went out to dinner with her husband. Tr. at 55. She testified that her husband did 80% of the grocery shopping. Tr. at 56.

### b. Witness Testimony

Plaintiff's mother Phoebe Pettit ("Mrs. Pettit") testified at the hearing. Tr. at 62–65. She indicated Plaintiff seemed excessively sleepy and depressed and often complained of body aches. Tr. at 63. She reported she visited Plaintiff nearly every day. *Id.* She stated she cared for Plaintiff's children and transported her to doctors' visits and to run errands. *Id.* She indicated she sometimes prepared or picked up meals for Plaintiff. Tr. at 64. She stated Plaintiff would nap twice a day for an hour to an hour-and-a-half each time. *Id.* She indicated Plaintiff would get up around 6:00 a.m. to help her daughter get ready for school, but would go back to sleep until 10:00 or 11:00 a.m. Tr. at 65. She testified Plaintiff would typically go to bed around 9:00 p.m. *Id.*

### c. Vocational Expert Testimony

Vocational Expert ("VE") William W. Stewart, Ph. D., reviewed the record and testified at the hearing. Tr. at 65–70. The VE categorized Plaintiff's PRW as a medical assistant as light with a specific vocational preparation ("SVP") of six and as a podiatric assistant as light with an SVP of six. Tr. at 66. He stated that Plaintiff had described some of her PRW as medium and heavy as performed. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform a full range of light work, except that the individual would require the ability to alternate between sitting and standing twice per hour; would be limited to lifting 10 pounds overhead; would be unable to climb ladders, ropes, or scaffolds; would occasionally be able to climb ramps or stairs,

stoop, and kneel; would frequently be able to reach with the right upper extremity; and should avoid concentrated exposure to excessive noise, vibrating tools, dust, fumes, gases, and hazards. Tr. at 67–68. He further explained that the individual would be limited to simple, routine, repetitive tasks; no production-rate work; no constant changes in routine; no complex decision-making, no crisis situations; occasional interaction with the public; and could stay on task for two hours at a time throughout the workday. Tr. at 68. The ALJ asked if there would be any jobs that the individual could perform. *Id.* The VE identified light jobs with an SVP of two as an office helper, *Dictionary of Occupational Titles* ("*DOT*") number 239.567-010, with 145,000 positions in the national economy; a marker/tagger, *DOT* number 209.587-034, with 89,000 positions in the national economy; and an inspector/hand packager, *DOT* number 559.687-074, with at least 100,000 positions in the national economy. Tr. at 68–69.

Plaintiff's attorney asked the VE if a hypothetical individual would be able to perform the identified jobs if she were to miss 20 percent of the work week. Tr. at 69–70. The VE stated the individual would be unable to perform any jobs. Tr. at 70.

Plaintiff's attorney asked the VE to consider that the individual would require at least two 60-minute breaks during an eight-hour workday. *Id.* The VE stated that no jobs would allow for that restriction. *Id.*

2.     The ALJ's Findings

In his decision dated July 7, 2016, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.
2. The claimant has not engaged in substantial gainful activity since August 28, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairments: narcolepsy and mood disorders (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), which consists of lifting and carrying up to 20 pounds occasionally and 10 pounds frequently. She requires a sit/stand option with the ability to change positions twice per hour. She should perform no overhead lifting over 10 pounds. The claimant is unable to climb ladder[s], ropes or scaffolds; but can occasionally climb ramps and stairs. She is limited to occasional stooping and kneeling; and frequent reaching with the right upper extremity. She should avoid concentrated exposure to excessive noise, vibrating tools, hazards and dust. She is capable of simple, routine and repetitive tasks; with no constant changes in routine, no complex decision-making, and no crisis situations. She is limited to occasional interaction with the public, and can stay on task two hours at a time throughout the day.
6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).
7. The claimant was born on April 12, 1980 and was 33 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).
8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).
9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).
11. The claimant has not been under a disability, as defined in the Social Security Act, from August 28, 2013, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 20–28.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      the ALJ did not properly assess the medical opinion evidence; and

2)      the ALJ did not comply with Social Security Ruling ("SSR") 96-8p in determining and explaining Plaintiff's RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged

in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing PRW;[7] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); SSR 82-62 (1982). The claimant bears

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v.*

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Medical Opinions

ALJs must carefully consider medical source opinions of record. SSR 96-5p (1996). The regulations direct that they accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2). If a treating source's opinion is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence of record, the ALJ may decline to give it controlling weight. SSR 96-2p (1996). Even if the ALJ determines the treating medical source's opinion is not entitled to controlling weight, he must proceed to weigh it, along with all

other medical opinions of record, based on the factors in 20 C.F.R. § 404.1527(c), which include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

Not only does 20 C.F.R. § 404.1527(c) specify the relevant factors to be considered in assessing medical opinions, it also provides guidance in weighing those factors. A treating source's opinion is entitled to deference and generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2); *see also* SSR 96-2p. Nevertheless, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. § 404.1527(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d)

(2004).[8] Finally, medical opinions from specialists regarding medical issues related to their particular areas of specialty should carry greater weight than opinions from physicians regarding impairments outside their areas of specialty. 20 C.F.R. § 404.1527(c)(5).

The ALJ must "always give good reasons" for the weight he accords to the opinion of the claimant's treating medical source. 20 C.F.R. § 404.1527(c)(2). If the ALJ issues a decision that is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." SSR 96-2p. This court should not disturb an ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The undersigned has considered the ALJ's evaluation of Dr. Khan's and Dr. Sherrill's opinions based on the foregoing authority.

---

[8] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

a.     Dr. Khan's Opinion

On August 28, 2013, Dr. Khan indicated he was afraid that Plaintiff would "not be able to work full-time with this kind of stressful job." Tr. at 394. On September 13, 2013, Dr. Khan indicated Plaintiff was having problems in her marriage and home life and was "currently unable to cope with the demands of the disease and work a very stressful job." Tr. at 379. He stated "I am afraid that this patient will not be able to work full time with this diagnosis and stressful limitations at work." *Id.* On October 9, 2013, Dr. Khan stated "because of her continuous need to take naps[,] patient is unable to work in a stressful job." Tr. at 439.

Plaintiff maintains the ALJ did not consider the applicable factors in 20 C.F.R. § 404.1527(c) in evaluating Dr. Khan's opinion. [ECF No. 17 at 20–21]. She contends the evidence did not support the ALJ's conclusion that her impairment had improved. *Id.* at 21–24.

The Commissioner maintains the ALJ reasonably gave little weight to Dr. Khan's opinion because it was based on Plaintiff's subjective complaints and was an opinion on an issue reserved to the Commissioner. [ECF No. 19 at 9–10].

The ALJ acknowledged Dr. Khan's opinion statements, but gave them little weight because he found them to be "based upon the claimant's subjective complaints" and to assume facts that were not supported by the record. Tr. at 25. He noted that Dr. Khan's October 2013 follow up notes showed Plaintiff's narcolepsy to be stable. *Id.* He stated that while February 2014 records indicated Plaintiff was experiencing some depressive symptoms, March 2014 records indicated she was feeling better. *Id.* He noted

that August 2014 psychiatry notes showed Plaintiff to have mild anxiety and a history of unintentional medication overdose, but that Plaintiff reported feeling better in October 2014. *Id.* He indicated that an October 2014 polysomnogram revealed no obstructive sleep apnea, upper airway restriction, or periodic limb movement to explain Plaintiff's daytime sleepiness. *Id.* He noted that Plaintiff had reported increased daytime energy after her dose of Fetzima was increased and had indicated an improvement in her depressive symptoms in December 2014. *Id.* He stated Plaintiff reported she was no longer driving more than 15 minutes from her home in February 2015, but that a physical examination was normal. *Id.* He noted that Plaintiff reported her mood had improved and denied side effects from medications in June 2015. *Id.* He acknowledged that Plaintiff complained of non-restorative sleep and daytime fatigue in January 2016, but that she stated her mood had improved and admitted she was not taking her medication on a regular basis. Tr. at 24–25.

The ALJ's explanation for his decision to accord little weight to Dr. Khan's opinion is deficient in that it ignores the substance of the opinion. Dr. Khan specified that Plaintiff's need to take naps prevented her from working a "stressful job" (Tr. at 439) and engaging in full time work (Tr. at 379), but the ALJ declined to address whether the evidence supported Dr. Khan's opinion that Plaintiff's need to take naps would prevent her from completing a normal workday.

Because Dr. Khan was Plaintiff's treating physician, his opinion was presumably entitled to controlling weight, provided that it was well-supported by medically-acceptable clinical and laboratory diagnostic techniques and was not inconsistent with the

other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2). Among the evidence that supports Dr. Khan's opinion that Plaintiff's ability to work would be limited by her need for prolonged naps are Plaintiff's testimony (Tr. at 41–42), Mrs. Pettit's testimony (Tr. at 63–65), Dr. Sherrill's records detailing Plaintiff's sleep patterns (Tr. at 499, 503, 507, 510, 590, 596–97, 604, and 608–09), the EEG findings (Tr. at 397), the MSLT findings (Tr. at 515 and 613), and Dr. Sherrill's opinion (Tr. at 584–87).

Although the ALJ cited normal polysomnogram results (Tr. at 24), he ignored the abnormal MSLT results that substantiated the narcolepsy diagnosis and provided objective support for Dr. Khan's opinion. *See* Tr. at 409. While the ALJ cited some instances in which Plaintiff reported increased energy or stability in her condition to support his finding that Dr. Khan's opinion was inconsistent with the other evidence of record, the evidence he cited was taken out of context. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis v. Berryhill*, --- F.3d. ---, 2017 WL 2381113, at *8 (4th Cir. 2017) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). The ALJ noted that Plaintiff reported her narcolepsy was stable on October 31, 2013 (Tr. at 24), when she presented to Dr. Khan with a complaint of neck pain, but he ignored that she had reported three weeks earlier that she was taking naps between 10:00 a.m. and 11:30 a.m. and 1:00 and 2:30 p.m. (Tr. at 438). He also failed to note that when Plaintiff visited Dr. Sherrill on November 19, 2013, she indicated she was continuing to nap for up to two hours per day. Tr. at 499. Thus, it appears Plaintiff's indication that her narcolepsy was stable meant that it had not

worsened, but did not mean it had improved to the point that she no longer required multiple daily naps. Although the ALJ cited Plaintiff's indication that she was feeling better overall on March 11, 2014 (Tr. at 24), he neglected evidence in the same treatment note that Plaintiff was continuing to nap frequently for 30 to 60 minutes at a time and that her naps were non-restorative. *See* Tr. at 510. The ALJ also cited evidence that Plaintiff was feeling better in October 2014 (Tr. at 24), but ignored her indication to Dr. Fitzgerald that her energy was "still low" and her fatigue was "horrible" (Tr. at 558). The ALJ noted Plaintiff's indication that her mood had improved and that Fetzima was helping in December 2014 (Tr. at 24), but neglected her reports in the same record of increased sleep, low energy, and never feeling rested. *See* Tr. at 562–63. He similarly noted Plaintiff's indication of improved mood in June 2015 (Tr. at 24), but ignored her indications that her energy was not much better and that she had ongoing fatigue and struggled with motivation. *See* Tr. at 570. The ALJ suggested that Plaintiff's reports of chronic excessive sleepiness and daytime fatigue could be attributed to her failure to take her medication on a daily basis, but the record shows that Plaintiff was following Dr. Sherrill's prior instruction to not take Xyrem every night. *See* Tr. at 601 and 604. Given this evidence, it appears the ALJ cherrypicked the record in an effort to discredit Dr. Khan's opinion and did not cite substantial evidence to support his decision to deny it controlling weight.

The ALJ's decision does not reflect adequate consideration of the treatment relationship between Plaintiff and Dr. Khan. *See* 20 C.F.R. § 404.1527(c)(2). The record reflects that Plaintiff initiated treatment with Dr. Khan in July 2012; treated with him on

roughly a monthly basis throughout 2013; and continued to treat with him until July 2014. *See* Tr. at 380–97, 402, 405, 43–32, 438–39, 455–56, 459–60, and 527–28. Although the ALJ acknowledged that Plaintiff was diagnosed with narcolepsy in February 2013, he did not acknowledge that Dr. Khan was the physician who diagnosed narcolepsy or that he provided Plaintiff's primary treatment for narcolepsy until she initiated regular treatment with Dr. Sherrill. *See id.* Finally, the ALJ failed to recognize Dr. Khan's specialization as a neurologist, which was another factor that weighed in favor of his opinion. *See* 20 C.F.R. § 404.1527(c)(5).

In light of the foregoing errors, the undersigned recommends the court find the ALJ failed to provide good reason for his decision to accord little weight to Dr. Khan's opinion.

b. Dr. Sherrill's Opinion

Dr. Sherrill provided a sleep disorders RFC questionnaire dated June 18, 2016. Tr. at 584–87. He noted that Plaintiff initiated treatment with him on November 19, 2013; returned for monthly follow up visits until March 2014; and returned every two to six months thereafter. Tr. at 584. Dr. Sherrill indicated Plaintiff's diagnoses included chronic excessive sleepiness and idiopathic hypersomnia. *Id.* He stated Plaintiff experienced excessive daytime sleepiness. *Id.* He noted that Plaintiff had recurrent daytime sleep attacks that could occur suddenly and in hazardous conditions; that typically occurred once or twice per day; that required greater than 30 minutes of sleep; and that could be precipitated by quiet and repetitive activity. *Id.* He specified that Plaintiff underwent a sleep study in October 2014 that showed no obstructive sleep apnea, upper airway

resistance syndrome, or periodic limb movement to explain her daytime sleepiness. Tr. at 585. He further indicated that Plaintiff underwent an MSLT that showed her to have hypersomnolence with sleep onset latency of 1.3 minutes, with 10 minutes being normal. *Id.* He noted that the MSLT findings suggested narcolepsy. *Id.* Dr. Sherrill indicated Plaintiff frequently experienced symptoms that would interfere with the attention and concentration needed to perform even simple work tasks during a typical workday. *Id.* He stated Plaintiff would be unable to perform routine, repetitive tasks at a consistent pace; detailed or complicated tasks; or fast-paced tasks. *Id.* He indicated Plaintiff would also be unable to adhere to strict deadlines and could not be exposed to work hazards. *Id.* He noted Plaintiff's medications caused mood changes that may have implications on her ability to work. *Id.* He estimated Plaintiff could continuously sit for 45 minutes at a time, but may fall asleep thereafter. *Id.* He indicated Plaintiff would require an average of five unscheduled breaks during an average eight-hour workday. Tr. at 586. He stated Plaintiff would have to rest for an hour before returning to work. *Id.* He indicated Plaintiff's daytime sleep attacks and chronic fatigue would cause her to require breaks. *Id.* He stated Plaintiff should avoid all exposure to driving, heights, power tools, dangerous moving machinery, and routine, repetitive tasks. *Id.* He estimated that Plaintiff was likely to be absent from work more than five days per month because of her impairments or treatment. Tr. at 587. He opined that Plaintiff's sleep disorder in combination with other impairments was at least as medically severe as Listing 11.03 for epilepsy characterized by minor motor seizures. *Id.* He explained that Plaintiff's "daytime sleepiness is profound

as evidenced by MSLT" and that she was "on maximum doses of stimulants with minimal improvement in daytime alertness." *Id.*

Plaintiff claims the ALJ erred in disregarding Dr. Sherrill's opinion and was required to explain his reason for concluding that her impairment did not meet or equal Listing 11.03. [ECF No. 17 at 27]. The Commissioner contends that the ALJ reasonably gave little weight to Dr. Sherrill's opinion because Dr. Sherrill did not support his opinion with objective findings or a narrative explanation. [ECF No. 19 at 11–13].

The ALJ indicated he gave little weight to Dr. Sherrill's opinion because "it was procured after the hearing, and apparently, in response to the hypothetical residual functional capacity discussed at the hearing." Tr. at 25. He stated Dr. Sherrill's opinion was not consistent with his treatment records, which showed Plaintiff's sleep cycles to have improved with medication and her stress to be related to situational problems with her husband and children. *Id.*

A review of the ALJ's decision shows that he did not cite sufficient evidence to support a decision to deny Dr. Sherrill's opinion controlling weight and failed to evaluate it based on all the relevant factors in 20 C.F.R. § 404.1527(c). Although the ALJ recognized that a treatment relationship existed between Plaintiff and Dr. Sherrill, his evaluation reflects no deference to the treatment relationship or consideration of the nature and frequency of treatment. *See* 20 C.F.R. § 404.1527(c)(2). The record supports Dr. Sherrill's indication that he treated Plaintiff on a monthly basis for sleep disorders from November 2013 through March 2014 and every two to six months thereafter. *See* Tr. at 499–501, 503–04, 507–08, 549–50, 596–97, 600–02, 604–06, and 608–09. While

the ALJ discounted Dr. Sherrill's opinion because he found that it was unsupported by evidence that Plaintiff's sleep cycles had improved (Tr. at 25), Dr. Sherrill's records demonstrated that Plaintiff continued to require prolonged daily naps. Tr. at 499, 503, 507, 510, 590, 596–97, 604, and 608–09. Therefore, the ALJ's evaluation of the supportability of Dr. Sherrill's opinion is flawed. *See Lewis*, 2017 WL 2381113, at *8. The ALJ did not properly evaluate the consistency between Dr. Sherrill's opinion and the other evidence of record. *See* 20 C.F.R. § 404.1527(c)(4). He did not consider that Dr. Sherrill and Dr. Khan were the only two physicians to treat Plaintiff's sleep disorder and that they offered similar opinions regarding her symptoms and functional limitations. *Compare* Tr. at 584–87, *with* Tr. at 379, 394, and 439. His decision is devoid of reference to the MSLT results, which supported the diagnosis of narcolepsy and provided objective evidence of Plaintiff's impairment and limitations. *See* Tr. at 613. His decision reflects no consideration of the consistency between Dr. Sherrill's opinion and the hearing testimony from Plaintiff and Mrs. Pettit. *See* Tr. at 41–42 and 63–65. He also failed to recognize Dr. Sherrill's sleep medicine specialization. *See* Tr. at 432 (referring Plaintiff for a second opinion) and 499 (identifying Dr. Sherrill as a physician practicing in the area of sleep medicine).

The undersigned has considered whether the ALJ erred in failing to evaluate Dr. Sherrill's opinion that Plaintiff's impairment was medically equal to the Listing for epilepsy. An ALJ may determine that a claimant's impairment is medically equivalent to a Listing if it is at least equal in severity and duration to the criteria of a Listing. 20 C.F.R. § 404.1526(a). For a claimant to prove that her impairment medically equals a

Listing, she must show one of the following: (1) that she has an impairment described in the Listings and has other findings related to her impairment that are at least of equal medical significance to the criteria specified in the Listing; (2) that she has an impairment that is not described in the Listings, but has findings related to her impairment that are at least of equal medical significance to those of a closely analogous Listed impairment; or (3) that she has a combination of impairments that do not meet any particular Listings, but are at least of equal medical significance to those of closely analogous Listed impairments. 20 C.F.R. § 404.1526(b). After identifying the proper Listing, the ALJ should "compare[ ] each of the listed criteria to the evidence of [the plaintiff's] symptoms." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). However, *Cook* "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." *Russell v. Chater*, 60 F.3d 824, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (Table). Rather, courts in the Fourth Circuit have found that a "point-by-point" analysis is required when, "there is 'ample factual support in the record' for a particular listing." *Beckman v. Apfel*, C/A No. 99-3696, 2000 WL 1916316, at *9 (D. Md. Dec.15, 2000).

The Social Security Administration's *Program Operations Manual Systems* ("*POMS*") specifies that "[a]lthough narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the closest listing to equate narcolepsy with is Listing 11.02,[9] Epilepsy." POMS DI 24580.005. Listing 11.02 requires the following:

---

[9] Dr. Sherrill indicated Plaintiff's impairment was equal to Listing 11.03 for epilepsy. Tr. at 507. However, POMS specifies that narcolepsy should instead be evaluated under Listing 11.02. POMS DI 24580.005. Under Listing 11.03 for nonconvulsive epilepsy, events must occur more frequently than once a week in spite of at least three months of

convulsive epilepsy (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least three months of prescribed treatment with:

(A) daytime episodes (loss of consciousness and convulsive seizures); or

(B) nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §11.02. In light of the direction in *POMS* and Dr. Sherrill's indications that he had treated Plaintiff for approximately two-and-a-half years; that she continued to experience recurrent daytime sleep attacks that could occur suddenly and in hazardous conditions; that her sleep attacks typically occurred once or twice per day; that she required greater than 30 minutes of sleep; that her sleep attacks could be precipitated by quiet and repetitive activity (Tr. at 584); and that she was "on maximum doses of stimulants with minimal improvement in daytime alertness" (Tr. at 587), the ALJ should have considered whether Plaintiff's impairment was at least equal in severity to Listing 11.02.

In light of the foregoing, the undersigned recommends the court find that substantial evidence does not support the ALJ's evaluation of Dr. Sherrill's opinion.

---

prescribed treatment, but under Listing 11.02 for convulsive epilepsy, the events only have to occur more frequently than once a month in spite of at least three months of prescribed treatment. *Compare* 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §11.02, with 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §11.03. Because Dr. Sherrill indicated Plaintiff's narcoleptic events met the frequency requirement under Listing 11.03, we can assume he would also find that they met the less-stringent frequency requirements under Listing 11.02.

2. RFC Assessment

Plaintiff argues the ALJ did not comply with the provisions of SSR 96-8p (1996) in explaining his RFC finding. [ECF No. 17 at 28]. She maintains the restrictions included in the assessed RFC do not account for her moderate difficulties in concentration, persistence, or pace. *Id.* at 29. She contends the ALJ did not account for her inability to sustain pace as a result of frequent and lengthy naps. *Id.* at 31.

The Commissioner argues that the ALJ's RFC assessment adequately accounted for all of Plaintiff's work-related limitations that were supported by the record. [ECF No. 19 at 13]. She maintains the ALJ considered Plaintiff's ADLs in combination with the other record evidence to conclude that her allegations of debilitating limitations were unsupported. *Id.* at 16–17.

A claimant's RFC represents the most she can still do despite her limitations. 20 C.F.R. § 416.945(a). To adequately assess a claimant's RFC, the ALJ must determine the limitations imposed by her impairments and how those limitations affect her ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and non-severe impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment

must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ found that Plaintiff had the RFC to perform light work; could lift and carry up to 20 pounds occasionally and 10 pounds frequently; required a sit/stand option with the ability to change positions twice per hour; should not lift greater than 10 pounds overhead; was unable to climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; could occasionally stoop and kneel, could frequently reach with her right upper extremity; should avoid concentrated exposure to excessive noise, vibrating tools, hazards, and dust; could perform simple, routine, and repetitive tasks; could not handle constant changes in routine, complex decisionmaking, or crisis situations; could stay on task for two hours at a time throughout the workday; and was limited to occasional interaction with the public. Tr. at 22. He acknowledged that Plaintiff testified that she stopped working because of extreme sleepiness and required naps "up to two times per day, despite sleeping 10 to 12 hours at night." Tr. at 23. He indicated Plaintiff had a "long history of feeling tired and fatigued." Tr. at 24. He also noted that Mrs. Pettit had testified that Plaintiff's impairment caused her to sleep excessively and that she had

assisted Plaintiff by caring for her children while she took naps. *Id.* He indicated he gave some weight to Mrs. Pettit's testimony. *Id.*

A review of the record does not demonstrate that the ALJ adequately considered whether Plaintiff's RFC allowed her to perform work-related physical and mental abilities on a regular and continuing basis. *See* SSR 96-8p. The record contains objective evidence that Plaintiff had a sleep disorder that caused her to fall asleep much more rapidly than the average person. *See* Tr. at 397, 409, and 613. It contains testimony from Plaintiff and her mother that her impairment caused her to engage in prolonged daily naps. Tr. at 41–42 and 63–65. It includes opinions from her physicians that Plaintiff's need to take naps would interfere with her ability to complete a normal workday. *See* Tr. at 379, 394, 439, and 584–87. Even though the record contained significant evidence to suggest that Plaintiff's need for prolonged daily naps would affect her RFC, the ALJ did not directly address this evidence or offer any reason for rejecting it in assessing Plaintiff's RFC. Although he purported to have given some weight to Mrs. Pettit's testimony, the assessed RFC does not reflect the limitations she indicated in her testimony. Therefore, the undersigned recommends the court find that remand is appropriate based on the ALJ's failure to assess Plaintiff's ability to perform relevant functions. *See Mascio*, 780 F.3d at 636.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is

supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

June 15, 2017                                        Shiva V. Hodges
Columbia, South Carolina                            United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).